Mr. Justice FIELD,
dissenting.
I am compelled to dissent from the judgment of the court in this case.
I am of opinion:
1st. That the penalty of the second section of the statute of March 3d, 1823, is superseded and repealed by the act of July 18th, 1866;
2d. That if the penalty be not thus repealed, the provisions of the section are not applicable to importers; and,
3d. That if the penalty be in force, and the section be applicable to importers, the court below erred in ruling that the knowledge by the defendants required by the section to subject them to the penalty prescribed, could be conclusively presumed from the knowledge possessed by their partner. •
The second section of the statute of 1823, under which the defendants are charged, is directed against the receiving, the concealing, and the buying of goods illegally imported and liable to seizure. It is not directed against anything else. Whoever does one of these three things, knowing that the goods have been illegally imported, and are liable to seizure under any act relating to the revenue, is subject, on conviction thereof, to a penalty of double the amount or value of the goods.*
The statute of July 18th, 1866,† in its fourth section, embraces not merely the three things designated in the statute of 1823, but several other things not thus designated in connection with the illegal importation of goods, or the disposal of such goods; and it prescribes for each a different penalty from that provided in the first statute. It is directed against the fraudulent importation of goods as well as against receiving, coucealing, and buying them after they are thus *554 imported. It further includes what is omitted in the statute of 1823, the selling of such goods and facilitating their transportation, concealment, and sale. It also declares that such goods shall be forfeited, and that every person who does any one of the things enumerated, shall, on conviction thereof, be subjected to a fine in a sum not exceeding five thousand dollars, nor less than fifty dollars, or to imprisonment not exceeding two years, or to both, in the discretion of the court. This is not all; the statute declares that present or past possession of the goods by the defendant shall be sufficient evidence to authorize his conviction, unless such possession be explained to the satisfaction of the jui'v-
The statute of 1866, as thus appears, is much broader in its provisions than the statute of 1823. It supplements the first statute by including as offences acts there omitted though equally connected as those designated with the disposal of goods illegally imported, and by providing a rule of evidence rvhieh renders it less difficult for the government to enforce the prescribed penalties. Had the statute of 1866 stopped here, there would be no preteuce that it conflicts with the statute of 1823. But it does not stop here; it goes farther and changes the punishment for the offeuces designated. By the first statute, the receiving, concealing, or buying any goods by a person knowing them to be illegally imported and liable to seizure under any revenue act, is punishable by a forfeiture of double the value of such goods. By the second statute, the receiving, concealing, or buying goods after their importation, by a person knowing them to have been imported contrary to law, is punishable by fiue and imprisonment, or both, at the discretion of the court. In both acts the same offences are designated, for the liability to seizure attends all illegal importation, and a knowledge of this latter fact necessarily includes the other. Both acts are penal; the first equally so as the last, for it does not go for the value of the goods, or indemnification to the government,- but for the enforcement of a penalty upon a party offending in any of the particulars mentioned. *555 The very definition of a penal statute is that it is a statute which inflicts a penalty for the violation of its provisions. It is admitted in the opinion of the majority of the court that the offences designated in the act might be prosecuted by information or indictment, an admission which seems to me to be inconsistent with the position that the act is not penal. I have not been aware that an information or an indictment could be founded on any statute which was not penal in its character.
Different punishments being prescribed for the same offences by the two statutes, the latter statute must be held, according to all the authorities, to have superseded and repealed the penalty prescribed by the first statute. Such was the unanimous decision of this court in Norris v. Crocker, reported in 13th Howard, a case which does not differ from this in any essential particular. That was an action of debt to recover a penalty prescribed by the fourth section of the act of Congress of 1793, respecting fugitives from justice and persons escaping from the service of their masters. That section declared that any person who should knowingly and willingly obstruct or hinder the claimant, his agent, or attorney in seizing or arresting the fugitive from labor, or should rescue him from such claimant, agent or attorney when arrested pursuant to the authority given by the act, or should harbor or conceal him after notice that he was a fugitive from labor, should for each of these offences forfeit and pay the sum of five hundred dollars, to be recovered in an action of debt.
Pending the action brought under this section, Cougress; in 1850, passed an act amendatory of, and supplementary to, the act of February, 1793, the seventh section of which embraced the same offences specified in the act of 1793, and created new offences and prescribed as a punishment for each offence fine and imprisonment upon indictment and conviction of the offender; the fine not to exceed a thousand dollars and the imprisonment not to exceed six months.
For obstructing the claimant or rescuing the fugitive, or harboring him, the act of 1793 declared that the offender *556 should “ forfeit and pay ” for each offence a specified sum, and authorized its recovery by civil action. For the same offences of obstructing the claimant, rescuing the fugitive, or harboring him, as well as for offences of a similar character, the act of 1850 declared that the offender should be punished by fine and imprisonment, and that this punishment should be enforced upon indictment and conviction.
The act of 1850 contained no repealing clause in terms, yet the court held unanimously that it was repugnant to the act of 1793, and necessarily operated as a repeal of the penalty of that act. That case is not distinguishable in principle from the case at bar. The act of 1793, like the act of 1823, prescribed a penalty recoverable by civil action. The act of 1850, like the act of 1866, prescribed, for the offences designated, fiue and imprisonment enforceable by iudictment.
It was urged with great force in the case of Crocker v. Norris, on the part of the government, that the act of 1850 only added cumulative remedies, and was enacted to give greater facilities to the master of the slave in securing the fugitive; that it was, as its title indicated, amendatory of and supplementary to the original act, and was designed to carry more effectually into execution a provision of the Constitution, and it could not be supposed that Congress having this object in view intended to repeal the act of 1793, and wipe out liabilities incurred under that act, and thus deprive the master of rights of action in suits then pending; but the court thought otherwise, Mr. Justice Catron delivering its opinion, and observing that, “ as a general rule it was not open to controversy, that where a new statute covers the whole subject-matter of an old one, adds offences, and prescribes different penalties for those enumerated in the old law, that the former statute is repealed by implication, as the provisions of both cannot stand together.”
The court did not seem to think that the fact that the penalty designated in the'act of 1793 was enforced by a civil action, and the penalty designated in .the act of 1850 was enforced by indictment, made any difference. In principle *557 the mode of enforcement could not alter the substantial and important fact that the penalty for the same offence was changed, and that by the change the sovereign power which created the original law had declared that its penalties should no longer be enforced.
If there were no other provisions of lawT than the two sections mentioned of the acts of 1828 and 1866 before us, I should not hesitate to repeat the language of this court in Norris v. Crocker, that it is not open to cohtroversy that the latter act repeals the penalty prescribed by the former. But there is another provision of law which removes, as it appears to me, all possible doubt as to the intention of Congress. The forty-third section repeals several acts byname, and also “ all other acts and parts of acts conflicting with or supplied by this act.”
Now, in my judgment, it does not admit of any question that an act, like that of 1866, which declares that certain specified offences shall be punished by fine or imprisonment, or both, does conflict with an act like that of 1823, which provides that the same offences shall be punished by a forfeiture of double the value of the goods in respect to which the offences are committed. And it appears to me that I have pointed out several particulars in which omissions of the act of 1823 are supplied by the act of 1866.
The eighteenth sectiou of the act of 1866, which is supposed by the majority of the court to preserve the penalty of the act of 1823, does, in my judgment, when read in connection with other provisions, have directly an opposite effect. That sectiou declares “that nothing in the act shall be taken to abridge, or limit, any forfeiture, penalty, fine, liability, or remedy provided for or existing under any law now in force, except as herein otherwise specially provided.” This means, as I read it, that the same punishments prescribed by law then in force, without abridgment or limitation, that is in kind, and extent, and mode of enforcement, shall continue to exist, unless for such offences other penalties and remedies are specially provided; and this is equivalent to declaring that such punishments and remedies *558 shall not continue to exist when other special provisions are made on the subject.
But if I am mistaken in this construction, and Congress did actually intend this strange and anomalous legislation, that for the offences designated there should be three distinct punishments inflicted: 1st, by a forfeiture of double the value of the goods illegally imported; 2d, by a forfeiture of the goods themselves; and, 3d, by fine, which may go from fifty dollars to five thousand, or by imprisonment, which may extend to two years, or by both; then I contend that the act of 1823 does not apply to the defendants in this case. They were the importers of the goods for double the value of which they are sued; and. the section applies only to offences committed after their importation. It is directed against the offences of receiving, concealing, or buying the goods with knowledge of their having been illegally imported and being liable to seizure. There are numerous other acts providing punishment for all forms of illegal importation. This act was only intended to reach those who, after the original offence was committed, in some way aided, with knowledge of that offence, in keeping the goods out of the reach of the government. The language used is inappropriate and inapt to describe an act of the illegal importer. It is limited to an act done after the illegal importation. It requires knowledge of such importation, which, as counsel observes, it would be absurd to require of the illegal importer himself. He receives his own goods in the act of importation, not afterwards; he cannot buy them of himself; and if he conceals them it is only an act in execution of the original offence.
The language is appropriate to describe an offence, which is in its nature accessorial after the fact, and counsel have cited several instances of legislation, where similar language has always been held applicable only to accessories after the fact. Thus in the Crimes Act of 1790* it is enacted “that if any person shall receive or buy any goods” stolen from *559 another, “ knowing the same to be stolen,” he shall be subjected to like punishment as in case of larceny. No one has ever supposed that this language was applicable to the act of the original offender. So in the General Post Office Act of 1825* it is enacted,in the forty-fifth section, “that if any person shall buy, receive, or conceal” any article mentioned in a previous section, “knowing the same to have been stolen or embezzled from the mail,” he shall be fined and imprisoned. It has never been thought that the purchaser, receiver, or concealer of the stolen property, with knowledge of the larceny, was any other than an accessory after the fact.†
So in the act of 1825, more effectually to provide for the punishment of certain crimes,‡ it is enacted that if any person upon the high seas shall “ buy, receive, or conceal ” any money, goods, bank-notes, or other effects, subject to larceny, feloniously taken, or stolen from another, “knowing the same to have been taken or stolen,” he shall be deemed guilty of a misdemeanor and be punished by fine and imprisonment. And the act shows, on its face, that the language was intended only for the offence of an accessory, for it declares that the person offending may be prosecuted, although the principal offender chargeable or charged with the larceny shall not have been prosecuted or convicted.
In all these cases the receiver, the concealer, and the buyer are accessories after the fact, aud the language would be inappropriate if applied to them in any other character; and in the present case it would be extending, in my judgment, the construction of a penal statute beyond all precedent to apply these terms, in the act of 1823, to the original importers.
The act which the illegal' importer is likely to do, after the importation, is to sell the goods, but the statute of 1823 does not make the act of selling them an offence. The statute of 1866 does, however, remedy this defect, which is *560 one evidence, among others, that it was intended to supply the deficiencies of the original act, and thus supersede it.
The declaration in the case in the counts, upon which double the value of the goods is charged, does not allege that the defendants illegally imported the goods, but that such importation was made by persons unknown, and that the defendants, knowing of the illegal importation, received, concealed, and bought them. Yet it appears that the entire action of the court on the trial, and its instructions to the jury, proceeded upon the supposition that the defendants and the absent partner were the owners of the goods, and that the defendants made the importation. It is expressly stated in the bill of exceptions that no attempts were made by either of the defendants, or any person connected with them, to conceal the property imported, or in any way to interfere with the exercise of the power of seizing it. The case rests, therefore, entirely upon the alleged acts of receiving aud buying.
If the penalty of the act of 1823 be not superseded and repealed, and the words used in that act are susceptible of the application made of them, I am still of opinion that the judgment should be reversed, for the ruling of the court below, that the knowledge of the illegal importation by the defendants, required by the act, was to be conclusively presumed from the knowledge possessed by their partner. The instruction of the court clearly went to this extent. After stating hypothetically to the jury that if certain matters were done by'Leman Stockwell, the shingles sent by him from New Brunswick to Bangor were illegally imported, the court instructed them as follows:
“ This being a civil action, and not a criminal prosecution, the knowledge of one of the firm on these matters in this suit, is to be deemed the knowledge of the defendants, his copartners in the shingle business.
“ If Leman Stockwell, as a member of the firm engaged in the shingle business, at the time of the importations and reception of the shingles at Bangor, knew that they were Province shingles, liable to duty and seizure, and illegally *561 imported, it is not necessary for the government to prove that the defendants personally had actual knowledge of these facts, which were then within the knowledge of their partner, Leman Stockwell.”
Here the court tells the jury that the knowledge of one of the firm, Leman Stockwell, is to be deemed the knowledge of the defendants, and that it is not necessary for the government to prove that the defendants, personally, had actual knowledge of the facts, which were within the knowledge of their partner.
If this language does not amount to an instruction that knowledge of the illegal importation by the defendants is to be conclusively presumed from the knowledge of their partner, it is difficult to perceive what else can be made of it.
The ruling of the court in this respect goes against all notions which I have hitherto entertained of the law on the subject of imputed guilty knowledge, and my sense of justice revolts against its application. I cannot reconcile to either law or justice the doctrine that a person can be charged and punished for knowingly doing a thing of which he never had any actual knowledge; and that in a proceeding to enforce penalties imposed for knowingly doiug a thing charged, the knowledge, which is an essential ingredient of the offence, can be conclusively imputed to him from its possession by another.
The claim in question, it is to be remembered, is not made for the forfeiture of the goods; that would follow from the act of illegal importation, without reference to the parties engaged. Neither is it made for the duties, for the right to them accrues to the government upon the importation. The claim is not for indemnification, but for penalties prescribed.
The principle upon which partners are made liable for the acts of each other is that each partner is the general agent of the partnership in all matters within the scope and objects of the partnership business. The liability and the limitations upon the liability are measured by the nature of the business of the partnership. The acts of one partner beyond that *562 business will not bind the firm, for his agency goes not to that extent.
Nor will any act of a partner, done in violation of law, bind his partners unless they originally authorized or subsequently adopted it. Such authorization and adoption are not matters to be presumed from the relationship of the partners to each other, but are to be proved like any other matters done outside of the scope of the partnership business, for which liability is sought to be fastened on the firm. It will often happen, owing to the position of the parties, the nature of the business, and the character of the act, that this authorization or adoption will be inferred from very slight additional circumstances. Thus in some cases it might be inferred that the importation of goods by one partner, without payment of the duties thereon, was approved by the other partners from the management taken by each partner in the affairs of the firm, and the knowledge which such management must give of the payments made and goods received. A jury might sometimes even be justified in inferring authority or approval of the other partners from their silence. But very different evidence would be required if, when one partner made the importation, the other was absent from the country or was a silent partner, taking no part in the management of the affairs of the firm. In the present ease the importation of the shingles by the defendants might have been consistent with entire ignorance that they were the product of New Brunswick, and therefore subject to duties. It does not appear that there wras anything in their shape or character which would inform the defendants of their foreign origin, of auything which would excite the suspicions, even, of the defendants on the'subject. They were brought to Bangor accompanied by the proper documentary evidence that they were of American origin.
Leman Stockwell, who was engaged in purchasing shingles in Maine and New Brunswick, was entitled to half the profits of the partnership, and the illegal transaction may have originated with him, to enlarge his share of the profits, and all knowledge that the shingles were of foreign origin *563 may have been concealed by him from the defendants. Many motives may be suggested for such concealment. His designs may have been frustrated or endangered by communicating them to his partners. Be this, however, as it may, certain it is that such knowledge by them cannot be presumed from the naked fact of their partnership with him. Presumptions are conclusions which the law draws from a particular state of facts, and the law does not draw from the mere fact of partnership the conclusion that one partner approves or is cognizant of the illegal acts of the other, but, on the contrary, the presumption of innocence, which every one may invoke for his protection when accused, repels such conclusion. The doctrine of imputed knowledge, and consequently of imputed guilt in such cases, finds no support in principle or authority. The adjudged cases all speak another language without a dissentient voice. Even the case of Regina v. Dean,* cited in the opinion of the majority, does not militate against this view. That was an information for penalties for unshipping goods without payment of duties, knowingly' harboring them, and removing them from a place of security. Under a practice of the custom-house the goods had been received without payment of the duties, an entry of the contents of the cases containing the goods having been made in a book kept for that purpose by the officers of the customs. A clerk of the defendant had removed the leaves in the book containing the entry and substituted other leaves containing false entries of the goods. There was no direct evidence that the defendant had been previously concerned in tampering with the book, nor was knowledge of the fraud brought directly home to him; but it appeared that he had, or must have, derived benefit from the fraudulent transaction. Under these circumstances the court told the jury that as the defendant had derived a benefit from the fraud, they might infer knowledge of the fraud on his part. On motion for a new trial, Baron Alderson, one of the judges, said:
“I think there was evidence for the jury of the defendant’s being acquainted with this fraud.
*564 “He obtained possession of goods for which less than the proper duty appeared to have been paid. If that were not so, it was incumbent on him to show that he paid the full amount of duty. He must have had books to show the price of the goods, and the amount of duties payable in respect of them; and those books he does not produce. He derives benefit from the fraud, and therefore the jury were warranted, in the absence of evidence to the contrary, in inferring that he had a knowledge of it.”
It is not perceived that this case, where the question of knowledge was left to the jury, can give support to the ruling in the case at bar, which was substantially, as I understand it, that knowledge must be conclusively presumed from the fact of copartnership.
The ease of Graham v. Pocock, recently decided by the Privy Council in England, is not without bearing upon this case, for it decides that one partner cannot be subjected to a penalty for an illegal entry by his partner of goods belonging to the partnership where he did not himself personally participate in such entry.* The report shows that appeals were taken from judgments in two actions brought upon an ordinance of the Colony of the Cape of Good Hope. That ordinance provided that no goods should be unladen from a ship in that colony until entry was made of the goods and warrants were granted for their unloading; that the person entering the goods should deliver to the collector a bill of entry containing, among other things, the particulars of the quality and quantity of the goods; and that any goods taken or delivered from a ship, by virtue of an entry or warrant not properly describing them, should be forfeited. The fiftieth section of the ordinance further provided that every person who should assist, or be otherwise concerned, in the unshipping, landing, or removal, or the harboring of such goods, should be liable to a penalty of treble the value thereof, or to a penalty of a hundred pounds, at the election of the officers of the customs. The first action was brought for *565 the forfeiture of goods imported by the respondents; the second action was brought for the penalty of treble the value of the goods under the fiftieth section. The facts of the cases were these: The respondents, Pocock aud Matthew, were partuers, doing business at Cape Town, in the Colony of Good Hope. Pocock, whilst in England, shipped to his partner at Cape Town twenty-five packages of glassware and three carriages. In the carriages a large number of corks were packed, which were liable to duty. When the goods arrived at Cape Town, the respondent, Matthew, made an entry for the landing of the glassware and carriages, in which no mention was made of the corks. For this defect in the entry the whole shipment was seized. The Supreme Court of the colony decreed a forfeiture of the carriages, but gave judgment for the respondents in the action for the penalty. On appeal to the Privy Council it was contended, in the second case, that the respondent, Matthew, who made the entry, was liable to the penalty of treble the value of the goods, and that Pocock, who was in England at the time, was answerable for his partner’s acts; but the court held that Matthew was liable for the penalty, and that Pocock, his partner, was not liable. Lord Cairnes, who delivered the opinion of the court, did not seem to think that the liability of Pocock was a matter to be considered, he not having participated in the actual entry. “I may put out of the case,” he said, “the first respondent, Pocock, for it was admitted that there was no case of personal culpability against him.” Personal, not imputed, culpability was here considered essential to a recovery by the crown.
It will be found on examination of the authorities that in all cases where a principal or partner has been held liable, penally or criminally, for the act of his agent or partner, the act was originally authorized or assented to, or subsequently adopted. The question in such cases has always been as to the effect of certain acts or employment as evidence of authorization, assent, or adoption, and it has always been held a matter for the jury.
*566 The cases of Rex v. Almon* and Attorney-General v. Siddon,† usually cited against this position, are consistent with it. In the first case, a bookseller was proceeded against for a libel sold in his bookstore by his servant in the course of his employment, and Lord Mansfield held that the relation of the defendant to the act of sale was primd facie evidence to establish his liability, but that he might avoid it by showing that “ he was not privy nor assenting to it nor eucouraging it.” Here such was the nature of the employment as to imply primd facie authorization of the sale and consequent publication of the libel by the master.
In the second case, a trader was held liable to a penalty for the illegal act of his servant done in conducting his business with a view to protect smuggled goods, although absent at the time. The case was an information for penalties, the second count of which charged that the defendant had harbored and concealed property upon which duties had not been paid. The court placed great reliance upon the fact that the possession of the property without explanation was primd facie evidence to warrant conviction, and that the special circumstances detailed in connection with the transaction and the employment of the servant presented a primd facie case of authorization by the master.
There are numerous cases where a principal or partner will be held liable for the fraud of an agent or partner although entirely ignorant of the fraud, as where goods are obtained by false and fraudulent representation; but the liability in such cases proceeds upon the ground that the title to the property in fact never passed to principal or partnership.‡
So a principal or partner will sometimes be held liable for the fraud of the agent or partner, which was not authorized, where the fruits of the fraud are retained; but the liability in these cases proceeds upon the ground that one cannot *567 claim immunity by reason of the fraud, and, at the same time, enjoy the benefits of the transaction. These cases properly fall under the head of implied adoption of the act of the agent or partner.*
So, sometimes, a principal or partner will be held liable where an agent or partner is allowed to exhibit an apparent authority which he does not possess, and, in consequence, fraudulently obtains the property or services of third parties; but the liability in such cases proceeds upon the principle that where one of two innocent parties must sufter, the party who, by his acts, clothes the agent with the apparent authority, and thus enables him to commit the fraud, ought to sutfer.†
In all these cases the principals or partners are held liable only to make good the loss occasioned by the fraudulent act of the agent or partner. The rule which governs these cases has no application to an action for penalties, which goes not, as already stated, for compensation or indemnification, but for punishment. Where penalties which are punitive, and not mere liquidated damages, are concerned, there must, in all cases, be personal culpability arising from original authorization of the fraudulent act, or assent to it, or its subsequent adoption with knowledge. This principle is of the highest importance, and its conservation is essential to a just administration of the law. As this principle was disregarded in the trial of this case in the court below, I think the judgment should, on that account, as well as for the other reasons stated, be reversed and the cause remanded for a new trial.

 3 Stat. at Large, 781.

 14 Id. 179.

 1 Stat. at Large, 116, sec. 17.

 4 Stat. at Large, 114.

 U. S. v. Crane, 4 McLean, 317; U. S. v. Keene, 5 Id. 509.

 4 Stat. at Large, 116, sec. 8.

 12 Meeson & Welsby, 39.

 Law Reports, 3 P. R. C. 345.

 6 Burrow, 2686.

 1 Crompton & Jervis, 220.

 Kilby v. Wilson, 1 Ryan & Moody, 178; Irving v. Motly, 7 Bingham 643 ; Root v. French, 18 Wendell, 570; Cary v. Hotailing, 1 Hill, 311.

 Bennett v. Judson, 21 New York, 238; Veazie v. Williams, 8 Howard, 134, 137.

 Locke v. Stearns, 1 Metcalf, 560; Story on Partnership, sec. 108; Story on Agency, 443; Hern v. Nichols, 1 Salkeld, 289.